**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

James Wren,

Plaintiff,

vs.

The Minneapolis Police Department, Nicholas J. Torborg, in his individual and capacity; Sgt. Charles Green, Craig Brown capacity, and John/Jane Does, in their individual capacity

Defendants.

Case No. 24-CV-04279 (ECT/DLM)

**DEFENDANTS' MEMORANDUM IN LAW OF MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Defendants respectfully bring this memorandum in support of its motion for summary judgment. Plaintiff brings a four Count complaint, having dismissed Sherry Appledorn and Counts VII-X. Doc. 63. Plaintiff takes issue with being handcuffed for an extended period of time following his arrest for murder, and being placed in the maximal restraint devise after he kicked a large hole in the interrogation room and refused to stop kicking it.

The Minneapolis Police Department should be dismissed because it is not an entity capable of being sued. Sgt. Charles Green and Craig Brown should be dismissed because they were never served with the complaint. The "Jane and John Does" should be dismissed as they are fictitious parties. Torborg should be

dismissed because placing him in handcuffs and ultimately the maximal restraint device was reasonable, and at the very least he is entitled to qualified immunity. Should the Court not dismiss Brown and Green for failure to serve them, their actions were also reasonable or alternatively are entitled to qualified immunity.

## FACTS

On June 10, 2019, Plaintiff James Wren shot two people in an alley outside of Augies, in downtown Minneapolis. Declaration of Tracey Fussy, Ex. 1 (police report) at 21. One of victims died as a result of being shot. *Id*. Plaintiff was subsequently convicted of second-degree murder. *Id*. at 1). On the evening of the shooting, an eye-witness to the shooting identified Plaintiff as the shooter and he was handcuffed and taken into custody by Defendant Nicolas Torborg. Fussy Decl., Ex. 2 at 7:33:17 -7:33:59 and 7:37:00-7:37:56; Ex. 1 at 83-8).

He was brought to what is referred to as Room 108 at City Hall. Fussy Decl., Ex. 1 at 83; Ex. 3 at 8:38:20. Walking into City Hall he is seen limping. Fussy Decl., Ex. 3 at 8:38:50-8:39:35. As he was walking to Room 108 Torborg asked him if he was sure he did not get hit tonight. *Id*. at 8:40:00. Torborg insisted he check Plaintiff for any gunshot wounds. *Id*. at 8:42:30. He then allowed Plaintiff to go to the bathroom. *Id*. at 8:44:30. One handcuff was briefly removed so that he could use the restroom. *Id*. That hand was then recuffed and he was brought to a conference

room. *Id*. at 8:46:50. The conference room had a video monitor relaying what was occurring inside of the room. Fussy Decl., Ex. 4 at 9:31:10-9:31:18. Plaintiff sat down in the chair and Torborg left the room, closing the door behind him at 8:47 GMT, or, 3:47 a.m. CST. Fussy Decl., Ex. 3 at 8:47:00-8:47:20. Regarding this time period, Plaintiff stated

> Whole time I'm talking to them. I'm being real calm. Let them know everything that was happening. Then they put me in room 108 with the handcuffs still on, and they left me there. I was waiting on the detective to coming in there. I wound up getting out of the chair, and getting on the floor, laying on the ground and going to sleep.

Fussy Decl., Ex. 5 at 35, ln 17-25, 36, 1-5.

At 8:54 Officer Molly Trupe, Torborg and Defendant Craig Brown were outside the room Plaintiff was in and capable of seeing what was happening inside of the room. Fussy Decl., Ex. 6 at 8:54:12-8:54:37. Brown and Trupe stationed themselves in the cubicle directly outside of the room Wren is in. *Id*. at 8:54-9:03. The video monitor was visible from where Brown was. *Id*. Brown shut off his body worn camera at 9:03:21. Fussy Decl., Ex. 6. Wren stated that he woke up and his arm was numb so he began to yell for help. Fussy Decl., Ex. 5 at 36, ln 3-7. He claims that no one came so he started kicking the wall. *Id*. at 36, ln 11-13.

At 9:27:43 Brown heard Plaintiff kicking and opened the door to the room Plaintiff was in. Fussy Decl., Ex. 7 at 9:27:43. He told Plaintiff to knock it off. *Id*. at 9:27:45. Plaintiff was on the ground and immediately demanded that the

handcuffs be taken off of him. *Id*. Brown told him to sit in the chair and Plaintiff stated that he wasn't doing "shit." *Id*. at 9:27:45-9:27:58. Plaintiff said the handcuffs are tight. *Id*. at 9:27:56. Brown stated "well you keep rolling on your own back." *Id*. at 9:27:58-9:28:00. Plaintiff kept demanding that the handcuffs be removed. *Id*. at 9:28:00-9:28:24. Brown then entered the room and ordered Plaintiff to sit in the chair. *Id*. at 9:28:22. Plaintiff repeatedly stated that he refused to sit in the chair. *Id*. at 9:28:22-38. Then he demanded to be taken out of the room. *Id*. at 9:28:39. Plaintiff again stated that the handcuffs are tight and Brown informed him that he can fit a whole finger in them. *Id*. at 90:28:54-9:29:02.

Plaintiff then calmly told him to get him up out of here. *Id*. at 9:29:02-9:29:19. When Brown asked him if he was going to keep kicking the door, Plaintiff yelled that he is "going to kick the shit out of this door." *Id*. at 9:29:19-9:29:25. He started kicking the door or wall again and Brown grabbed his leg and ordered him to stop. *Id*. at 9:29:25-9:29:35. But Wren does not stop and kicked the wall again hard breaking away from Brown's grasp. *Id*. at 9:29:35-9:39:40. Brown left the room and Plaintiff was heard kicking the wall hard repeatedly. *Id*. at 9:29:48-9:31:19. In the meantime, Officer Molly Kiewatt had gone to retrieve Torborg. Fussy Aff., Ex. 7 at 9:30:00; Ex. 8 at 9:30:58. Torborg and Kiewatt headed back to Plaintiff. (Fussy Decl., Ex. 4, 9:31:15.

Plaintiff continued to demand to be taken out of the room. *Id*. 9:31:15-9:31:30. Torborg asked Plaintiff what was wrong with him and Plaintiff replied that they had handcuffs on him like he did something wrong. *Id*. at 9:32:00-9:32:09. Plaintiff then stated that he thought his hand is swelling up. *Id*. at 9:32:10. Then he again demanded to be taken out of here and kicked the wall hard. *Id*. at 9:32:10-9:32:23. The wall has a hole about 2 feet by 3 feet. *Id*. at 9:32:23. Torborg put a hand on Plaintiff's shoulder and told him to calm down and relax. *Id*. at 9:32:40-9:32:58. Plaintiff demanded to be taken to jail. *Id*. at 9:32:53. As Torborg told him he is going to sit down and relax and then Plaintiff kicked the wall hard again and again. *Id*. at 9:32:55-9:33:00.

Torborg then rolled Plaintiff onto his back with the assistance of Brown and another officer, while Kiewatt began to place a maximal restraint device on his ankle. *Id*. at 9:33:01-9:33:29. At this point they realized they needed a strap to go around his waist. *Id*. at 9:33:28. Brown ran to his squad to retrieve the strap, and the ankle strap was secured loosely through his handcuffs while they waited for Brown to return. *Id*. at 9:33:30-9:33:59. His legs could extend fully to the ground. *Id*. at 9:36:02. Brown then came back with a second strap and the maximal restraint device was placed around his waist and then secured to the strap that held his ankles. *Id*. at 9:35:02-9:38:33. He was immediately rolled onto his side. *Id*. at 9:38:33. The full damage to the wall is 4 feet by 3 feet of drywall destroyed and smashed.

*Id*. at 9:38:42. Plaintiff rolled himself back onto his stomach. *Id*. at 9:40:21. Torborg left the room and asked Brown to watch him. *Id*. at 9:40:50.

Brown and Kiewatt were stationed outside of the room. Fussy Decl., Ex. 7 at 9:40:56-9:41:15. Two additional officers came to the door of the room as well. *Id*. at 9:41:20. Green was standing 20 feet from the door and called everyone over to him. *Id*. at 9:41:39. Another officer was closer to the room Plaintiff is in. *Id*. at 9:42:46. An officer walked back to Plaintiff about two minutes later and was seen checking on him. *Id*. at 9:43:16-9:43:22. Brown was fully stationed outside of the room seconds later. *Id*. at 9:43:28. The officers brought a chair in to move Plaintiff to the squad and Plaintiff rolled back onto his side. *Id*. at 9:44:40-9:44:48.

The maximal restraint device was removed at the jail and Plaintiff walked from the sally port to the deputies. When Plaintiff was booked into jail he was seen by a nurse and given over the counter medication for knee pain. Fussy Decl., Ex. 9, at 25; Ex. 10 at 110. He reported that he was tackled by police when they arrested him and pulled his leg all the way back and he heard a pop. Fussy Decl., Ex. 10 at 109. He did not mention any issue with his wrist. *Id*. Nor did he mention being tackled by police any other time. In fact, in his deposition he stated simply that Torborg saw him running and started to chase him, that he threw the gun and then Officer Young put him in handcuffs. Fussy Decl., Ex. 5 at 34, ln 9-24. He had suffered from a previous gun shot wound to that knee, though. Fussy Decl., Ex. 10

at 109. It was noted at his jail intake that he was able to stand, that there was no swelling or deformity and that pain only started after he was brought back to his cell. *Id*. at 110.

During his time at Hennepin County Jail and Minnesota State Prisons post-conviction, he complained about his wrist a total of two times time. The first time was September 22, 2022. *Id*. at 83-85. He reported to his provider that he had been writing a lot and that his right wrist and forearm radiating to his elbow had been bothering him. *Id*. at 87. He was concerned he could have carpal tunnel. *Id*. The provider determined the pain was most likely due to overuse with reported daily writing and he was prescribed ibuprofen. *Id*. at 85.

The second time he reported wrist pain was in July 2025. *Id*. at 41-43. He filed this lawsuit with the Court on November 25, 2024. (Doc. 1). On December 17, 2020, he filled out a form asking him to list any other health problems you have been seen for by a medical provider and he listed only “bad right knee.” Fussy Decl., Ex. 10 at 17. On July 11, 2025, he reported to his provider that he thought he had nerve damaged and that he experienced numbness and tingling. Id. at 43. He attributed this directly to being handcuffed. *Id*. The provider gave him a brace to use. *Id*. The first and only time he mentioned wrist injury due to handcuffing was over six years after the incident and after he filed this lawsuit. *See* Fussy Decl., Ex. 9 and 10.

Sammy Cage was brought in for questioning as a witness to the shooting. Fussy Decl., Ex. 1 at 9, 28; Ex. 12. His handcuffs were removed during his witness interview. Id., Ex. 12.

## STANDARD OF REVIEW

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an essential element to the party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). "Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Coates v. Powell*, 639 F.3d 471, 475 (8th Cir. 2011).

A non-moving party may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Tindle v. Caudell*, 56 F.3d 966, 969 (8th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). A sufficient showing is not made by the "mere existence of a scintilla of evidence . . . there must be evidence on which the jury could reasonably find for

the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). And the Court may not allow a case to go forward to trial on the mere chance that a jury will disregard all evidence and accept the unsupported speculation of a party. *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1991), *cert. denied*, 507 U.S. 913 (1993).

Summary judgment cannot be denied based on a party's speculation of conjecture as to what may have occurred. *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994. ).

> In order to withstand the motion for summary judgment, [the non-moving party] must substantiate [their] allegations with 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'

Moody, 23 F.3d at 1412 (quoting, *Gregory v. Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)).

## ARGUMENT

### I. MINNEAPOLIS POLICE DEPARTMENT IS NOT A LEGAL ENTITY CAPABLE OF BEING SUED.

As a threshold matter, the Minneapolis Police Department must be dismissed because it is not an entity capable of being sued "Absent authority expressly conferred by statute or ordinance, an agency or department of a municipal corporation does not have the capacity to sue or be sued as a separate entity." The Minneapolis Police Department constitutes such an entity not subject

to suit. *Embaye v. Minneapolis Police Department*, 2016 WL 3960374 *12 (D. Minn. June 22, 2016)(citing *De La Garza v. Kandiyohi Cnty. Jail, Corr. Inst.*, 18 Fed. Appx. 436, 437 (8th Cir. 2001) (per curiam) (holding that Kandiyohi County Sheriff Department was not an entity subject to suit under 42 U.S.C. § 1983)). Accordingly, the party "Minneapolis Police Department" must be dismissed.

## II. JOHN AND JANE DOES MUST BE DISMISSED

Additionally, the parties captioned "Jane and John Does" must also be dismissed. Discovery closed on March 2, 2026, and the case is set for trial in August 2026. "Fictitious parties must eventually be dismissed, if discovery yields no identities. *Willenbring v. City of Breezy Point*, 2010 WL 3724361 *3 (D. Minn. September 16, 2010).

> [S]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up [sic] moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.

*Johnson v. Charps Welding & Fabricating*, Inc., 2018 WL 3978111, at *3 (D. Minn. Aug. 20, 2018)( quoting, *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)).

Here, Plaintiff amended his complaint adding added Craig Brown, who is the John Doe identified in Paragraph 15 of his Second Amended Complaint, and Charles Green. Doc. 53. Discovery did identify the two other officers involved in placing Plaintiff in the maximal restraint devise, and he chose not to substitute

their names and serve them. Fussy Decl., Ex. 11 at 5. Additionally, although Plaintiff claimed that "as many as eight Defendants (John Does) or more intentionally brutally assaulted the Plaintiff repeatedly while being held in the interrogation room" only five officers were in the room with him: Torborg, Brown, Kiewatt, Green and Stender. Accordingly, the Court dismisses his claims against the unidentified defendants.

## III. DEFENDANTS BROWN AND GREEN SHOULD BE DISMISSED FOR INSUFFICIENT SERVICE OF PROCESS

Plaintiff filed the operative second amended complaint with the Court on August 15, 2025, but failed to ever serve the second amended complaint on Defendants Green and Brown. See Court Docket (no summons returned executed for Second Amended Complaint). Although Plaintiff was allowed to amend the complaint, he was still required to personally serve the Second Amended Complaint upon newly named defendants Brown and Green. Rule 4m required Plaintiff to serve Brown and Green within 90 days of filing it with the Court. Rule 4(m). Plaintiff filed the Second Amended Complaint on August 25, 2025. Doc. 53. Defendants' answered, asserting the affirmative defense of "insufficient service of process." Doc. 58 at 7. Plaintiff never served the newly named defendants. Accordingly, these defendants must be dismissed.

## IV. DEFENDANTS ACTIONS WERE REASONABLE AND THEY ARE ALSO ENTITLED TO QUALIFIED IMMUNITY

### A. The use of handcuffs for two hours was not unreasonable

Plaintiff alleges Defendant Torborg and Brown violated the constitution by placing him in handcuffs for too long and that they were tight. The use of handcuffs was a de minimis use of force and was reasonable. Defendants are entitled to qualified immunity on Plaintiff's excessive force claim related to his handcuffing.

The qualified immunity doctrine analyzes two questions: first, taken in the light most favorable to the person alleging injury, do the facts alleged show that the officer's conduct violated a constitutional right? *Saucier*, 533 U.S. at 201. If no constitutional right has been violated, there is no necessity for further inquiry concerning qualified immunity. *Id*. Second, was the constitutional right allegedly implicated clearly established at the time of the events in question? *Id*.

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent."

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002), quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

A court may deny a request for qualified immunity only if it is obvious that no reasonably competent officer would have concluded that the conduct was legal. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If rational officers could possibly disagree on the legality of the actions, qualified immunity applies. *Id*. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004). An officer does not lose qualified immunity because of a mistaken, yet reasonable belief as to the legality of his actions. *Saucier*, 533 U.S. at 205-06.

The use of handcuffs does not usually amount to excessive force unless it results in more than minor injuries. *Haning v. Lee*, 415 F.3d 822, 824 (8th Cir. 2005) (citing *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003)). In *Crumley*, the Eighth Circuit held that the plaintiff had not been subjected to excessive force when handcuffed because she presented no evidence of long-term injury and "allegations of pain as a result of being handcuffed, without some evidence of more permanent injury, are [not] sufficient to support [a] claim of excessive force." 324 F.3d at 1008. In *Robinson v. Hawkins*, dug into *Crumley* using it for support to dismiss an excessive force claim based on handcuff injuries – pain and bleeding - that were "fairly minor," concluding that it was a de minimis use

of force and it did not violate a clearly established right. 937 F.3d 1128, 1136 (8th Cir. 2019).

Plaintiff's excessive force claim fails for three reasons. First, Plaintiff did not complain about the handcuffs being too tight when they were originally placed. In *Bowen v. City of St. Paul*, the plaintiff claimed excessive force due to the way the officers placed the handcuffs on him in a way that caused injury to his wrist and shoulder. 2015 WL 4094060 *1 (D. Minn. July 7, 2015). The Court observed that contemporaneous video showed that Plaintiff did not complain about the handcuffs for 30 minutes. The court held that handcuffing someone arrested for strong-arm robbery, placing him in a squad handcuffed and leaving him handcuffed where he does not complain of pain for at least 20 minutes after he was handcuffed was objectively reasonable. *Id*. (citing, *Chambers v. Pennycook*, 641 F.3rd 898, 907 (8th Cir. 2011)). Here, Plaintiff only begins to complain about the handcuffs being tight after he chose to lay on the floor, 45 minutes after he was re-handcuffed. And even then, his complaints are more targeted to the necessity of being handcuffed at all, rather than any pain.

Second, Plaintiff chose to roll onto the floor and fall asleep on his arms rather than stay seated in the chair. Plaintiff began kicking the door and an officer checked on his handcuffs noting that they were not too tight as he could get a

finger between the handcuff and Plaintiff's hand. Plaintiff caused any pain he claims when he chose to lay on the ground, fall asleep and roll onto his back.

Third, although Plaintiff claims he has occasional numbness and has been told he has nerve damage, he has provided no medical records to support his claims. Without medical records, he cannot support a claim of a long-term injury as a result of the handcuffs. *Foster v. Metropolitan Airports Com'n*, 914 F.2d 1076, 1082. And without evidence of a more permanent injury, Plaintiff cannot support a claim of excessive force. *Foster*, 914 F.2d at 1082. There is simply no evidence in the record to support that Plaintiff suffered any sort of long-term injury as a result of the handcuffs. He did not complain of wrist pain at any point after he was booked until September 2022- over three years from this incident, and ever then he attributed it to hand-writing too much. He did not complain of any wrist pain associated with this incident until July 2025 -- six years from this incident and after he filed his lawsuit. Moreover, he has not been diagnosed with any malady. He was given over the counter medication and a brace to wear. Plaintiff has failed to demonstrate that the handcuffing amounted to more than a de minimus force and should be dismissed under qualified immunity as that amount of force did not violate a clearly established right. *Robinson v. Hawkins*, 937 F.3d at 1136.

### B. Placing Plaintiff in the maximal restraint device was reasonable because he was kicking a hole in the wall and refused to stop kicking it.

Plaintiff argues that being placed in the maximal restraint devise was extreme assault and battery. (Doc. 53 at ¶17). He also claims that in doing so, Defendants bent his leg so far that his right knee popped out of place. *Id.* Defendants are entitled to qualified immunity on Plaintiff's excessive force claim related to being placed in the maximal restraint devise.

To establish a Fourth Amendment seizure claim, a plaintiff must prove that the amount of force used was objectively unreasonable under the particular circumstances. *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006). The reasonableness of the officer's conduct is judged under the totality of the circumstances confronting the officer. *Graham v. Connor*, 490 U.S. 386, 396, (1989). The U.S. Supreme Court has explained:

> Because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective. We set out a test that cautioned against the '20/20 vision hindsight' in favor of deference to the judgment of reasonable officers on the scene.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001). The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead on whether the seizure actually effectuated falls within a range of conduct which is objectively "reasonable" under

the Fourth Amendment. *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995). Graham identified a list of factors relevant to the merits of the constitutional excessive force claim, "requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Saucier*, 533 U.S. at 205 (quoting *Graham*, 490 U.S. at 396).

Qualified immunity operates to protect officers from the sometimes "hazy border between excessive and acceptable force." *Id.* "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004).

Here, placing Plaintiff in a maximal restraint device was reasonable, or at the very least, defendants are entitled to qualified immunity. Plaintiff was placed in Room 108 at 8:47 GMT. Fussy Decl., Ex. 3. He kicked the door at 9:27. Fussy Decl., Ex. 7 at 9:27:43. Brown came into the room and checked his handcuffs when he complained that his hands were numb. *Id*. He was told to sit up and Plaintiff refused. *Id*. Two minutes later he started kicking the wall. *Id*. at 9:29:25. He was ordered to stop but continued to kick the wall creating a large hole in the dry wall of the wall. *Id*. at 9:29:48-9:31:19; Ex. 4 at 9:38:42. At 9:31, Torborg entered the room and ordered him to stop kicking the wall. Fussy Decl., Ex. 4 at 9:31:15. Plaintiff

kicked it again. *Id*. at 9:32:55. Because he would not stop kicking the wall, and had already caused significant property damage, he was placed in the maximal restraint device. The devise secures the feet together and then brings his feet back and loosely connects the feet through a strap that is connected on the other end to Plaintiff's belt. *Id*. at 9:35:02-9:38:33. The feet are never secured directly to the waist. While he was being secured, Torborg briefly placed his weight on Plaintiff's upper back. Once he was secured, he was rolled over onto his side. Id. at 9:38:33.

Here, Plaintiff was kicking the wall, creating significant damage and refused to stop when ordered to do so. He was already handcuffed, and that did not prevent him from kicking the wall. Verbal orders did not stop him either. He was placed in the device because he refused to stop kicking the wall. Fussy Decl., Ex. 5 at 44, ln. 21-24 – 45, ln 3-5. Placing him in the restraint device was an objectively reasonable restraint. *See Traylor v. Buck*, 20024 WL 5452667 *13 (D. Minn. November 19, 2024)(citing *Cravener v. Shuster*, 885 F.3d 113, 1139 (8th Cir. 2018)).

In *Maynard v. Hopwood*, 105 F.3d 1226, an arrested person was placed in a hobble device after she was kicking inside the squad car and hit an officer. *Maynard*, 105 F.3d at 1227. The Eighth Circuit held that the hobbling of the plaintiff, amongst other actions, were reasonable given her resistance. *Id*. at 1228 (holding hobbling reasonable but treatment of allegedly being slapped in the face

and punching in the chest and using racial epithet after being hobbled and handcuffed was not reasonable).

To the extent Plaintiff claims a constitutional violation for being left in the prone position, that claim fails. First, Plaintiff rolled himself into the prone position because he did not want to speak to a detective. Ex. 4 at (9:40:21); Ex, 5 at 47, ln 16-22. Second, being in that position has never been held to be a constitutional violation in and of itself. *Hanson as Trustee for Layton v. Best*, 915 F.3d 543, 548 (8th Cir. 2019). In *Hanson*, the plaintiff alleged excessive force for keeping the decedent in the prone position for an excessive length of time leading to his death. 915 F.3d at 548. The decedent was in a prone position for over fifteen minutes. *Id*. at 546-547. The Eighth Circuit concluded the officers were entitled to qualified immunity because the case law provided "no clearly established right against the use of prone restraints for a suspect that has been resisting." *Id*. Moreover, the court held that there was not a robust consensus amongst other circuits regarding prolonged prone restraint. *Id*.

Here, Plaintiff rolled himself onto his stomach, officers were just outside the open door to where he was and he was on his stomach for about two minutes. Ex. 7 at (9:41:20- 9:43:16). No weight was placed on him once he was in the device. Plaintiff being in a prone position while restrained for three minutes was not a constitutional violation, and at a minimum, it was not clearly established at the

time of this incident in June 2019. Accordingly, Defendants are entitled to qualified immunity at the very least and this claim should be dismissed.

## V. PLAINTIFF'S COUNT II INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS AS A MATTER OF LAW

Plaintiff brings a claim of intentional infliction of emotional distress. Plaintiff's claim for intentional infliction of emotional distress is barred by the state's two-year statute of limitations.

### A. Claim barred by statute of limitations

There is a two-year statute of limitations on torts "resulting in personal injury." Minn. Stat. §541.07, subd. 1. The personal injuries covered by the two-year statute of limitations are "intentionally administered injury to the person . . . and not that which resulted from the want of due care." *Wild v. Rarig*, 302 Minn. 419 (Minn. 1975) (quotation omitted). This two-year statute of limitations applies to the tort of intentional infliction of emotional distress. *Christenson v. Argonaut Ins. Companies*, 380 N.W.2d 515, 518–19 (Minn. App. 1986); *Wenigar v. Johnson*, 712 N.W.2d 190, 209 (Minn. App. 2006).

Under Minnesota law, an action is commenced when a summons and complaint have been properly served on the defendants. *Concordia College Corp. v. W.R. Grace & Co.*, 999 F.2d 326, 328–29 (8th Cir.1993); Minn. R. Civ. P. 3.01. "State rules for the service of process apply to pendent state law claims." *McKenzie v.*

*Lunds, Inc.*, 63 F. Supp. 2d 986, 1001 (D. Minn. 1999) (citing, *e.g.*, *Anderson v. Unisys Corp.*, 47 F.3d 302, 309 (8th Cir. 1995)).

This incident occurred on June 10, 2019. Plaintiff served the complaint on January 13, 2025, more than two years after the alleged injuries. (Doc. 10).[1] Thus, Plaintiff's claim of intentional infliction of emotional distress is barred by the two-year statute of limitations in Minn. Stat. §541.07, subd. 1. against Defendants.

**B. The tort claim fails as a matter of law**

Plaintiff's allegations also fail to establish a claim for intentional infliction of emotional distress. Plaintiff alleges being handcuffed and placed in the maximal restraint device constituted intentional infliction of emotional distress.

The claim of intentional infliction of emotional distress is "sharply limited to cases involving particularly egregious facts." *Hubbard*, 330 N.W.2d at 439. There are four elements which must be established: (1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused Plaintiff emotional distress; and (4) Plaintiff's distress was severe. *McDonald v. City of Saint Paul*, 679 F.3d 698, 708 (8th Cir. 2012).

To proceed with a claim of intentional infliction of emotional distress, the conduct "must be so atrocious that it passes the boundaries of decency and is

[1] Plaintiff did not personally serve Brown or Green.

utterly intolerable to the civilized community." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983) (quotation omitted). Plaintiff was arrested for murder, placed in handcuffs and then subsequently placed in a maximal restraint device when he refused to stop kicking and damaging the wall in the room he was being held. This was reasonable, as argued in Section IV, *supra*. These actions cannot be construed as "so atrocious" as to "pass the bounds of decency." *Hubbard*, 330 N.W.2d at 4396.

## VI. PLAINTIFF'S COUNT III FOURTH AND FOURTEENTH AMENDMENT CLAIM FAILS AS A MATTER OF LAW

Plaintiff's Fourth Amendment claims are addressed above under Section IV. The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This requires state actors "to treat similarly situated people alike." *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985)).

To state a claim under the Equal Protection Clause, a plaintiff must allege the state actor intentionally discriminated against the plaintiff because of membership in a protected class. *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (8th Cir. 1990). When there are multiple differences, the difference in treatment can be due to a number of considerations, conscious or otherwise, many of them

legitimate. *Jennings*, 383 F.3d 189 at 1214. Analogously, the Supreme Court requires a substantially more rigorous pleading burden on plaintiffs bringing claims of selective law enforcement. *Id*. (citing *United States v. Armstrong*, 517 U.S. 456, 463–64 (1995) (describing the pleading requirement for selective prosecution equal protection claims as "a significant barrier to the litigation of insubstantial claims"). Plaintiff alleges no incidents where non-black persons, under similar circumstances as here, were not handcuffed and placed in a maximal restraint device. There is not a single allegation of a similarly situated person being treated differently than Plaintiff. Accordingly, this count fails as well.

## VII. PLAINTIFF'S COUNT IV CIVIL CONSPIRACY AND MONELL CLAIM MUST BE DISMISSED

Plaintiff's conspiracy claim fails because no actors outside of City employees were involved in the decision to handcuff Plaintiff, place him in Room 108 and then place him in the maximal restraint devise. Because a conspiracy by its nature involves multiple parties, this doctrine provides that "a local government entity cannot conspire with itself through its agents acting within the scope of their employment." *L.L. Nelson Enters., Inc. v. Cty. of St. Louis, Mo.*, 673 F.3d 799, 812 (8th Cir.2012). Government agents can act within the scope of their employment duties "even though [a] complaint alleges improprieties in the execution of these duties." *Id.*

In order to state a claim for conspiracy under § 1985, a plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement. *City of Omaha Emps. Betterment Ass'n v. City of Omaha,* 883 F.2d 650, 652 (8th Cir.1989). The allegations of a conspiracy must be plead with sufficient specificity and factual support to suggest a meeting of the minds directed toward an unconstitutional action." *Nelson v. City of McGehee,* 876 F.2d 56, 59 (8th Cir.1989). The Second Amended Complaint does not mention any communication occurring between City employees and any other entity.

Plaintiff also asserts a Monell claim under this Count. Under § 1983, a municipality cannot be held liable for its employees' allegedly unconstitutional acts under a theory of respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Rather, a municipality may be liable only if the plaintiff can show that an official policy of the government is "the moving force of the [alleged] constitutional violation." *Monell*, 436 U.S. at 694. It is only when the "execution of a government's policy or custom . . . inflicts the injury" that the municipality may be held liable under § 1983. *Id.* at 694. There is no support in the record for this claim. "[F]or municipal liability to attach, individual liability must first be found on an underlying substantive claim." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007). Because these claims fail as a matter of law, this claim must be dismissed.

Plaintiff has not sued the City of Minneapolis, accordingly, this claim must be dismissed. Second, Plaintiff's Second Amended Complaint mentions two incidents of persons who were kneeled on in the prone position: David Smith and George Floyd. Doc. 53 at ¶34, 42. Both cases are factually dissimilar. In both cases, the arrested person was not only in the prone position, but also had weight placed on their back or neck for several minutes, and died. Plaintiff briefly had weight placed on his side while he was placed in the maximal restraint devise and once secured, he was immediately rolled into the recovery position and no one held him in place. Finally, there was no adjudication that the officers in the Smith matter violated any constitutional right. And the Floyd murder happened after this incident, thus it could not be the moving force behind what happened here. Also, the officers involved were immediately fired.

## VIII. PLAINTIFF'S COUNT V DISCRIMINATION COUNT FAILS AS A MATTER OF LAW

Plaintiff alleges he was discriminated against because he did not have the handcuffs removed. He cites as an example of the difference in treatment that Sammy Cage received. Count V seems subsumed by Count III, which alleges a Fourteenth Amendment claim, but to the extent it isn't, this claim fails as well.

Plaintiff was placed in handcuffs because he was arrested for murder immediately following the shooting. Fussy Decl., Ex. 1 at 21. He was identified as

the shooter at the scene. *Id.*, Ex. 1 at 83-84; Ex. 2 at 7:33:17-7:33:59 and 7:37:0-0-7:37:56; Ex. 1 at 83-84. Sammy Cage was not a murder suspect. *Id.*, Ex. 1 at 9, 28. His handcuffs were removed because he was a witness to the shooting and not the suspect. *Id*. Moreover, Mr. Cage is the same race as Plaintiff. Fussy Decl., Ex. 11. Thus, Plaintiff provides no example, again, of him being treated differently than similarly situated people. In fact, it shows that the reason he was handcuffed was not because of his race, but because he was a murder suspect.

## IX. PLAINTIFF'S NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW

Plaintiff alleges that while in Room 108 officers should have checked on him to check on his welfare. Official immunity rests on the same rationale as federal qualified immunity: courts must ensure that the threat of suit does not inhibit public officials' exercise of discretion in discharging their duties. *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991); *Holmquist v. State*, 425 N.W.2d 230, 233 n.1 (Minn. 1988). "[A] public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion. Generally, police officers are classified as discretionary officers entitled to that immunity." *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn. 1990). When a public official's duties require the exercise of discretion or personal judgment, personal liability for damages will attach only when the harmful action

is made willfully or maliciously. *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992). Official immunity is broadest when officers act in emergency situations and high-risk circumstances. *Pletan*, 494 N.W.2d at 40. The Minnesota Supreme Court explained that in such circumstances, "questions must be resolved under emergency conditions with little time for reflection and often on the basis of incomplete and confusing information. It is difficult to think of a situation where the exercise of significant, independent judgment and discretion would be more required." *Id.* at 41.

Accordingly, to overcome Defendants' official immunity, Plaintiff must establish that Defendant Officers acted with malice. To prove malice, Plaintiff must provide proof of Defendant Officers' "intentional doing of a wrongful act without legal justification or excuse." *Rico,* 472 N.W.2d at 107. The question of malice is an objective inquiry into the legal reasonableness of an official's actions. *Miskovich v. Indep. Sch. Dist.*, 226 F. Supp. 2d 990, 1021 (D. Minn. 2002). The willful or malicious wrong exception to official immunity "does not impose liability merely because an official *intentionally* commits an act that a court or jury subsequently determines is a wrong. Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited." *Rico*, 472 N.W.2d at 107 (emphasis in original).

There is no evidence in the record to support that any Defendant acted with malice here when Plaintiff was briefly left in the interrogation room while officers were near the open door. As the officers were getting ready to transport Plaintiff to jail, Green called Brown and Kiewatt over to briefly explain what needed to be collected and how to bag it. All of the officers were still nearby and one of the officers walked back to him about two minutes later. There is nothing demonstrating malice on Brown's part. He simply listed to a superior officer telling him to come over to him to explain how to preserve evidence for a double-shooting murder investigation.

Additionally, Plaintiff cannot prove all elements of the claim. To prove a negligence claim, Plaintiff must establish: (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of the duty being the proximate cause of the injury." *Reichel v. Wendland Utz, LTD*, 11 N.W.3d 602, 912 (Minn. 2024)(quotation omitted). Plaintiff fails to show any injury as a result of being in a self-imposed prone position alone for about two minutes. Plaintiff did not even know he was alone at the time because he was facing away from the opening of the door. Fussy Decl. at 48, ln. 9-16.

**CONCLUSION**

For the reasons stated above, Defendants respectfully request the Court to grant the motion for summary judgment.

Date: April 30, 2026

KRISTYN ANDERSON
City Attorney

By *s/ Tracey Fussy*
TRACEY FUSSY (3117807)
HEATHER P. ROBERTSON (0390470)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 673-2254
(612) 299-2742
tracey.fussy@minneapolismn.gov
heather.robertson@minneapolismn.gov

*Attorneys for Defendants Minneapolis Police, Nicholas Torborg, Charles Green and Craig Brown*